BONE *v.* THE STATE.

1. The evidence showed that this was a case of murder, and the prisoner's statement was sufficient to show it.
2. The statutory provisions for two sections of the superior court in counties which contain a city of ten thousand inhabitants, are not unconstitutional.
3. That the judge, when the prisoner and his family and counsel were passing from the court-room into an adjoining room to consult, remarked, "This is spectacular," and also said to the solicitor-general, "Small potatoes, and stringy at that," in reply to an objection by that officer to a proceeding by the prisoner's counsel, was no such ruling or intimation by the court as would be the subject-matter of review; nor can this court say whether such remarks were calculated to work the prisoner any injury.
4. It was error to admit testimony as to the contents of a note which had been lost, the witness not having shown any knowledge of the handwriting of the person alleged to have written it, either by having seen her write or having had correspondence with her, or having stated that he knew her handwriting. But this is not such an error as should work a reversal, inasmuch as without this evidence the accused would properly have been convicted, nor could the jury have rendered any other verdict than that of guilty of murder.
5. The charge of the court fairly and fully submitted to the jury all the issues involved in the case.
6. While the judge might have been content, on the subject of the prisoner's statement, to have given the jury the rule laid down by the statute, yet the instructions given upon this point did not injure the plaintiff in error, as the law in substance was given in charge.
7. Looking at the whole charge, this court is satisfied that the judge intended to instruct the jury upon the subject of justifiable homicide, self-defence under the code being the same as justifiable homicide.
8. The judge fairly left it to the jury to say whether in this case there were "other instances" than those mentioned in the code, §4330, which stood upon a like footing of reason and justice with those specifically enumerated in that section.
9. The judge properly refused to give a charge which there was no evidence to sustain.
10. When a witness has been put under the rule, and comes into the court-room while other witnesses are upon the stand and hears their testimony, it is discretionary with the court to allow him to testify. It is not erroneous to allow a witness who has been

put under the rule, but who has entered the court-room and heard the prisoner's statement, to testify in rebuttal of the same.

11. What objections were made at the trial to evidence the admission of which is complained of, must be specifically stated.

November 10, 1890.

Criminal law. Murder. Courts. Jurisdiction. Constitutional law. Statutes. Trials. Practice. Evidence. Charge of court. Witness. Before Judge RICHARD H. CLARK. Fulton superior court. March term, 1890.

On the trial of J. C. Bone, the evidence showed, among other things, as follows: On the evening of the homicide, two or three hours before it occurred, he borrowed a pistol, and said he wanted to shoot a d—d rascal, or a d—d man. On the same evening, Woodward, the deceased, went to Bone's house between seven and eight o'clock, and into the room of defendant's daughter, Jessie, where he remained until nearly ten, defendant being present when he came. Jessie came out of the room and said that some one was in there. Defendant asked who it was; and his wife replied that if he was obliged to know who it was she would tell him, and that it was Mr. Woodward. Defendant ate his supper, and said there were things going on in his house that he did not like and that he was tired of, and that he was going to kill Woodward. He picked up a chop-axe; said the room-door was fastened; went out on the back porch, and said he was going in there if he had to break the door open. He was told that he had no right to kill Woodward. He called a young woman, showed her a pistol and asked if Woodward was gone. She went in, returned and told him that he was not; and defendant went away. In a short time Woodward also left. About eleven o'clock, the defendant returned and said he had killed Woodward, that he had always said he was going to do it, and that if the witness mentioned it to any one, he would kill her the same way. He told her he had to leave

town, asked her for money, and again left the house; and she was asleep when he again returned. Before coming to see Jessie, Woodward usually wrote her a note. Other young men came to see her. The first time defendant ever objected to Woodward's coming, though he had known of it, was after certain furniture was taken away from the house. This furniture had been selected by Jessie, who instructed the seller to carry notes for it to Woodward, who she said was to pay for it. This was done, and Woodward signed the notes and made a payment, but on subsequent default the dealer sent for and obtained the furniture. When it was delivered at the house, the defendant asked who bought it; and Mrs. Bone told him she bought it. He did not know that Woodward had anything to do with it; but when it was removed, defendant became angry and objected to his being there. He made different and conflicting statements about the killing, after it occurred, to the coroner's jury and others. At first he denied knowledge of the shooting, but subsequently admitted having done it; and finally told the coroner's jury that he met Woodward and asked if that was Woodward; that Woodward replied yes; that the defendant said, "You have been coming to see my daughter, and I want you to stop"; that Woodward replied, "Why, it is none of your d—d business"; and that then defendant shot Woodward, who moved off, and defendant shot again. He further said that if Woodward had not made that remark, he did not think he would have shot him.

The prisoner's statement was, in brief, that this had been going on six or seven months; he had been trying to find out whether or not Woodward was a married man, and a few days before the killing, had learned that he was, but never saw him until that night; went home as usual, and after supper, heard somebody walking in

the house; asked who it was, and repeated the question three or four times before receiving an answer, and finally his wife told him it was Woodward; he said he was going to see Woodward, and went out and picked up a hatchet and threw it down at the gate; then went away from the house, and after asking several persons for a pistol, borrowed one; then returned, met Woodward, asked if it was he and received an affirmative answer; then said, "I want to have a little talk with you," and Woodward replied, "All right." "I says, 'Is you a married man?' He says, 'Is that any of your business?' I says, 'I learn that you are a married man; you have been coming to see Jessie, and I am going to put a stop to it'; and he said, 'I will come to see Jessie as much as I d—d please,' and he grabs me. I throws my hand back right there [indicating], and in the struggle I shot him; and after I shot him he run up the hill, and after he stopped there I went on home. That is the whole truth. I didn't borrow the pistol, gentlemen, to kill Mr. Woodward; I borrowed it to protect myself and family. . . I was born in 1832 or 1833, I forget which. I never had any difficulty in my life; I never had any fight in my life. I have been living in Atlanta since 1853."

The grounds for new trial not fully stated in the opinion are as follows:

Counsel for the defendant, followed by him and his family, walked across the judge's platform and in the rear of his seat on their way to the prisoner's room for consultation; and as they did so, the judge remarked, "This is spectacular," upon which there was laughter in the audience. The error assigned is, that this remark was calculated to place and did place movant and his family in ridicule before the jury, and him and his counsel at a great disadvantage in securing fair and impartial consideration by the jury; and that the effect of it was to

impress the jury that the court and the audience considered the trial as a mere farce.

A policeman witness identified certain keys as found in the Bone house, and on cross-examination, testified that every one of them was so found, and that he recognized them. The solicitor-general tendered the keys in evidence, and the defendant's counsel tossed them to his associate counsel, saying, "There, Frank, take your keys from the bunch." The solicitor-general objected to this transaction; and the judge said, "Small potatoes, Mr. Hill." "And few in the hill, your Honor," replied the solicitor-general. "And stringy at that," rejoined the judge, who certifies that he meant that the transaction was too small to treat seriously as affecting the merits of the trial. The defendant assigned error because such remarks were an expression of opinion by the court upon the evidence, and were such as to humiliate counsel in the presence of the jury, to the detriment of defendant and his defence; it being his right to cross-examine the witness and to demonstrate before the jury that he was a mere machine, if such could be done.

A witness testified that he was acquainted with the handwriting of Jessie Bone, and saw a note from her that Woodward had, about certain furniture; that he never saw Jessie Bone in the act of writing, and the way by which he knew her handwriting was the frequency of the notes that were brought to his place of business, where Woodward was employed at work for him; that the notes were all signed in the same handwriting, and the note about the furniture was in the same handwriting of the others he had seen, which were a good many; but that he did not know whether she wrote the others. He was asked by the solicitor-general what, if any, threat was made in the note about the furniture. The defendant objected, because the

witness, never having seen Jessie Bone in the act of writing, knew nothing, actually, about her handwriting. The objection was overruled.

The next ground is, that the court did not fairly and fully submit, in his charge to the jury, the issues involved in the case; the jury being confined to the simple propositions that a father may kill a man to prevent adultery with his daughter, if there is a necessity for it, and is not justifiable in killing another who has committed adultery with his daughter, after the adultery has been committed. The defendant contended that he had knowledge of Woodward's previous visits, but thought they were legitimate; had just ascertained that he was a married man; went to the door to inquire if such were a fact, for the purpose of prohibiting further visits; found the door locked and went away; met him coming away from the house; asked him if he was a married man, and warned him to discontinue his visits; he refused, and after a struggle defendant shot him to prevent his further visits and his debauching his daughter.

After calling attention to the evidence, the court charged: "In contrast with that, he has given you his statement not under oath. The law gives that right to every person who is tried for a crime or misdemeanor; whether it is a felony or a misdemeanor, it confers that right upon every defendant in every case; he is allowed to give to the jury his version of it, to say to them such facts as he thinks necessary to say in his own defence; and then the law says the jury may give that statement just such force as they may see fit." Error, 1st, in speaking of the statement as being "in contrast" with the evidence; and 2d, in denominating it the prisoner's version of it.

The court charged: "All other instances, now you see, the law has defined as specifically as it can; and

having recognized, or realized rather, that there may be some cases of self-defence that have not been specifically defined by human foresight or sagacity, it adds this other section so as to cover what it might have failed to specify ; and it says, all other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide. Then you are to consider the principles of self-defence which I have read to you, and also this section, and determine in your own mind if the defendant has brought himself within any of the instances as prescribed by the code, which stand upon the same footing of reason and justice as those enumerated. Now the defendant claims before you what he considers the same footing of reason and justice, that he killed Mr. Woodward—he fired the pistol shot which took his life—because of his criminal or proposed criminal connection with his daughter. That section, gentlemen of the jury, has undergone the review of our Supreme Court. The only guide I have for my judgment, and which I am to impart to you for your judgment, is the construction that tribunal has given to this section. Therefore, I charge you the expounding of this section by the supreme judicial tribunal of the State, establishing the following principles." Error, because the jury must naturally have concluded that the judge did not himself believe that such a defence was good in law, and gave such charge only because the Supreme Court had so construed the section; and such an intimation was prejudicial to the movant, and such reference to the Supreme Court was error.

F. R. WALKER and J. A. GRAY, by brief, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, C. D. HILL, solicitor-general, and W. C. GLENN, *contra.*

BLANDFORD, Justice.

The plaintiff in error was convicted in the superior

court of Fulton county of the offence of murder, and he moved the court for a new trial upon the several grounds contained in his motion, which was refused by the court, and he excepted.

The general grounds, as to the verdict being contrary to law and the evidence and without evidence to support it, seem to us untenable. The evidence introduced by the State showed very clearly, as will appear by the record, that this was a case of murder. Even the statement of the accused himself was sufficient to show that this was a case of murder.

The first special ground in the motion for a new trial alleges that RICHARD H. CLARK, the presiding judge, had no authority to hold the superior court of Fulton county, or to try movant upon the charge preferred against him, the said RICHARD H. CLARK being judge of the Stone Mountain judicial circuit, and MARSHALL J. CLARKE, the judge of the Atlanta judicial circuit, at the same time holding and presiding over the superior court of Fulton county, then in session and engaged in the trial of civil business in the room provided by the county authorities for the superior court; and movant avers that the act of the legislature of Georgia providing for two sections of the superior court in counties wherein there is a city of ten thousand inhabitants, and incorporated in section 247(a), (b), (c), (d) and (e), of the *addenda* to the code of Georgia, and acts amendatory thereof, is unconstitutional and void. Article VI, section III, paragraph I, of the constitution of this State, declares: "There shall be a judge of the superior courts for each judicial circuit, whose term of office shall be four years, and until his successor is qualified. He may act in other circuits when authorized by law." The eighth paragraph of the following section declares that "The superior courts shall sit in each county not less than twice in each year, at such

times as have been or may be appointed by law." The
act which is called in question by the plaintiff in error is
that of September 29th, 1879 (Acts of 1878–9, p. 149),
as amended by the act of December 24th, 1886 (Acts of
1886, p. 34), which act is entitled "An act to declare
and amend the laws of this State touching the juris-
diction and modes of procedure in the superior courts
in certain cases, so far as relates to counties having
therein a city of ten thousand or more inhabitants."
The act of 1879, as amended by the act of 1886, makes
provision that two or more judges of the superior court
may preside in bank, or that said courts may be held
in two or more sections at the same time by different
judges, in any separate rooms in the court-house or at the
county-site, as may be convenient; the second section
providing for exceptions to the rulings of the judge, and
writs of error to the Supreme Court. The original act
provides that "all business, and all causes pending or
which may be brought in said courts, other than indict-
ments for felonies, which latter are to be tried in the
said superior courts in manner and form as heretofore
practiced," shall be embraced within its provisions.
This section was amended by the act of 1886 so as to
embrace "all business and all causes, whether civil or
criminal, pending or which may be brought in said
courts." We do not think that the act of 1879, as
amended by the act of 1886, is in any manner in con-
flict with the constitution of this State; and therefore
the plaintiff in error can take nothing by this ground
of his exception. The constitution requires *at least* two
sittings of the superior court in each county, but does
not prohibit more sittings to be held, nor does it pro-
hibit two or more sections of the superior court pre-
sided over by different judges sitting at the same time,
where the interest of the public requires the same to be
done, so that justice shall not be denied to any one.

Nor is it unconstitutional because it provides for this scheme only for counties containing large cities, the legislature having power to classify in general terms.

The error assigned in the second ground of the motion is as to the conduct of the presiding judge, who, when the prisoner and his family and his counsel were passing from the court-room into an adjoining room to consult, remarked, "This is spectacular." We do not think this was any ruling or such intimation by the court as would make it a subject-matter of review by this court; and we cannot say whether it was calculated to work the plaintiff in error any injury or not. The third ground of exception complains of certain remarks made by the court to the solicitor-general, as follows: "By the court, 'Small potatoes, Mr. Hill.' By Mr. Hill, 'And few in the hill, your Honor.' By the court, 'And stringy at that.'" We do not clearly understand the meaning of these remarks by the court and the solicitor-general, but this assignment of error is subject to what we have already said as to the second ground.

The fourth ground complains that the court committed error in admitting in evidence, over the objection of defendant's counsel, the contents of a certain note which it was claimed was written by Jessie Bone, the daughter of the accused, to the deceased, Woodward. We think the court ought not to have admitted the contents of this note in evidence, the note having been lost and the witness not having shown any knowledge of her handwriting, either by having seen her write or having had correspondence with her, or having stated that he knew her handwriting. A witness may testify to handwriting if he knows the same, and it matters not how that knowledge may be acquired; but it is very clear to our minds that he should have that knowledge before he can testify as to the contents of a

writing which is lost.    While we think this was error,
we do not think it was such an error as should work a
reversal of this case, inasmuch as we are satisfied that
without this evidence the accused would properly have
been convicted; and, indeed, we cannot see how the
jury could have rendered any other verdict.    Were this
a close case upon the facts, however, we might be in-
clined to reverse the judgment, and doubtless would.
The case of *Smith* v. *The State*, 77 *Ga.* 705, does not
apply to the facts of this case.    In that case the wit-
ness did identify the letter by a certain blot thereon,
which he noticed when he carried the letter to defendant.

The fifth assignment of error complains that the
court did not fairly and fully submit all the issues in
the case to the jury.    We think, upon reading the
charge of the judge who tried the case, that he fairly
and fully submitted to the jury all the issues involved
in the same.

The sixth assignment of error complains of the in-
structions which the court gave to the jury as to the
prisoner's statement.    We think the court might have
been content on this subject to have given to the jury
the rule laid down by the law; that is, that the prisoner
has a right to make a statement, and the jury may give
to that statement such force as they may think proper,
and may believe the same in preference to the sworn
testimony in the case, if they think it be true; but we
do not think that the instructions of the court to the
jury upon this point injured the plaintiff in error in
any way whatever, as he gave in substance the law in
charge.

The seventh ground complains that the court erred
in charging the jury as follows: "The defendant main-
tains before you that the homicide was committed in
self-defence."    The error complained of is, that the
blending together of the terms "self-defence and justi-

fiable homicide" was unnecessary and illegal.   In look-
ing at the whole of the charge we are satisfied that the
court intended to instruct the jury upon the subject of
justifiable homicide, self-defence under our code being
the same as justifiable homicide.

The eighth ground of the motion complains that the
trial judge erred in charging the jury as to the meaning
of "all other instances," which occurs in that section of
the code defining justifiable homicide.   We do not
think that the criticism upon the charge of the court
as implied in this ground of error is well-sustained by
the record.   We are of the opinion that the court very
fairly left it to the jury to say whether in this case
there were "other instances" than those mentioned in
the code, which stood upon a like footing of reason and
justice with those specifically enumerated in that sec-
tion of the code cited by the court, which should be
deemed justifiable homicide.   We think the court gave
a very fair exposition of this section of the penal code.

The ninth assignment of error is the refusal of the
court to give the following in charge to the jury, as was
requested in writing by defendant's counsel : " If the
deceased had been in the habit of visiting the daughter
of the defendant at the defendant's house and there
having criminal intercourse with her, and the fact of
such criminal intercourse having come to the father,
and he killed the deceased for the purpose of prevent-
ing further criminal intercourse with his daughter, and
such killing was then and there necessary to prevent
the deceased from having further criminal intercourse
with the defendant's daughter, then it would be for you
to say whether this would be one of those instances
enumerated in sections 4331, 4332 and 4333 of the code
of Georgia ; and if you find such to be the case, then
you would be authorized to find the killing to be a justifi-
able homicide, and the defendant not guilty."   We

think the court did right in refusing to give this request in charge to the jury, there being no evidence to authorize the same, the evidence being that the accused knew on the night of the homicide that the deceased had visited his daughter, threatened to kill him, went off some distance to procure a pistol, and when the deceased had left his house and had proceeded some distance therefrom, he was shot down by the accused, and from the wounds died. There was not a particle of evidence to show that he killed the deceased to prevent him from having further illicit intercourse with his daughter; so we think the court did right to refuse this instruction.

The tenth ground of the motion complains that the court erred in refusing to give in charge to the jury a request made by the defendant in writing, which is almost identical with the one above quoted. What we have said as to the last ground of error assigned, applies equally to this.

The eleventh ground complains that the court erred in refusing to give the following written request by defendant: "The daughter, so long as she is a minor and resides under her father's roof, is subject to his control. It is his right, within the bounds of reason, to say who shall or who shall not visit and associate with her there. If a person has been visiting even with her father's knowledge and without his objection, and the father afterwards ascertained that the purposes of such visits were for the commission of adultery or fornication, or fornication and adultery, he has the right to demand that such visits cease, and to use just such force as is necessary to prevent their repetition. The penal code enumerates certain instances of justifiable homicide, and then in another section sets forth the general provisions, ' all other instances which stand upon the same footing of reason and justice. as those enumerated shall

be justifiable homicide.' One of the principles of reason and justice on which a homicide can be justified is this: that such homicide was committed as a defence against a serious injury, or to stay its progress. A father has the right—yea, it is his duty—to protect and defend his daughter against the seducer or the fornicator. So long as the daughter is a minor and resides under her father's roof, it is her duty to conform to any reasonable and just regulations he may lay down for guiding her conduct or choosing her associates, and it would be the duty of all other persons to acquiesce in the father's authority or directions, so far as known, in respect thereto; and if any man should violate this principle for the purpose of seduction or fornication, the father would have a right immediately and swiftly to resort to force for his own and her protection, and to use just so much force as is necessary, and to make such defence complete and effective, even to slay the aggressor if such killing should be actually necessary for such purpose." We think what we have already said as to other objections will equally apply to this exception.

The twelfth ground of the motion for a new trial complains that the witness J. M. Wright, over defendant's objection, was permitted to testify in rebuttal to the defendant's statement. The witnesses were separated under the statute, but about the time defendant went upon the stand, witness Wright entered the court room and took his seat beside the solicitor-general, remaining there all the while defendant was making his statement; and counsel for the accused contend that the said Wright was rendered incompetent as a witness, especially as in rebuttal to the prisoner's statement. When witnesses are "put under the rule," as it is called (that is, when they are separated), and one or more of them should come into the court-room, even

while other witnesses are upon the stand, and hear what was testified to by them, this court has held that it is discretionary with the court below to allow such witnesses to testify or not. But in this case, where the prisoner came forward and took the stand to make a statement, there was clearly no error to allow a witness who had been put under the rule, but who had entered the court-room and heard this statement, to testify in rebuttal of the same.

The thirteenth ground complains that the court erred in permitting the solicitor-general to propound to witness J. M. Wright, over defendant's objection, the following question : "What did he say, if anything, about any struggle, in that statement before the coroner's jury ?" to which the witness responded: "He did not say they had any struggle; said didn't have." The precise objection to this testimony is not stated, and we do not see very readily why the same was error. But we have frequently ruled that objections of this sort to the evidence must state the ground of objection which was urged at the time of its introduction.

The fourteenth ground of the motion for a new trial is subject to the same objection. It complains of the introduction of certain evidence by the witnesses Wright, Gunn, Bedford, Simpson and others, without stating upon what ground the evidence was objected to.

The fifteenth ground we do not consider, for the reason that the objection to the evidence is not stated; nor, so far as the record discloses, was it stated to the court below.

The sixteenth ground complains that the court erred in refusing to rule out, upon defendant's motion, the answer of the witness Hall as to the contents of the note said to have been written by Jessie Bone to the deceased. We have already disposed of this ground of the motion.

The seventeenth ground of the motion complains that the court erred in permitting a certain witness, over defendant's objection, to testify as to certain matters, it not appearing, however, that the grounds of this objection were stated or urged before the court at the time the testimony was admitted.

These embrace all the grounds in the motion for a new trial; and upon considering the whole case, we think there was no error on the part of the court below in refusing to grant a new trial.   *Judgment affirmed.*